First case of the day, June Medical Services, L.L.C. v. G. Ms. Murrow. Good morning. May it please the Court. Louisiana is here today because the District Court failed to hold the plaintiffs to the burden of proof that's required to facially invalidate a law. The Court in this case failed to acknowledge that the facts in this case were different, the regulatory scheme is different, and that the law should have been applied differently. You mean different from Texas? Is that what you mean? Yes, different from Texas, because the Texas case, in the first place, Whole Woman's Health was brought after it had already been through the gauntlet here on facial invalidity. It was then brought to the Supreme Court on an as-applied challenge to the two clinics and then a challenge to the ambulatory surgery center's applicability across the state. So it fundamentally came up differently to the United States Supreme Court, but the facts were very, very different, too. I think that we go to great lengths in our brief to talk about the difference in the impact in Texas when you look at what happened there and the clinics that were closed here. But we start, I think, with facial invalidity, and facial invalidity requires the plaintiff to meet a very high standard of proof, and there's a reason for that. The reason is because the state goes through a democratic process to enact those laws, and the burden is high to invalidate them. Here, the court really failed to even mention the standard for facially invalidating a law. He went straight to Whole Woman's Health, and he applied a fairly reflexive application of Whole Woman's Health after going through a number of legal errors and factual errors to get to that result. So I would start by focusing on what we believe to be some of the fundamental problems with facial invalidity and how the court flipped the burden of proof to the state. The court did several things. He attributed private party conduct to the state in several instances. He attributed state hostility to abortion also to the state, just general hostility to abortion by quoting and citing two laws that are valid state laws that were passed and upheld as constitutional. And then he also violated Pennhurst by adopting an interpretation of state law, contrary to the Secretary of the Department's health interpretation of state law, in order to disqualify DOTU's privileges. So, I mean, on at least three instances, the court made legal errors in order to force the facts to fit what he believed to be the result that was compelled by Whole Woman's Health. And so we submit to you that the legal errors create enough of a basis for you to reverse this judgment, but we would also point to a number of different factual problems. He exaggerated the burdens. He minimized the benefits. And in doing so, he basically undercut the entirety of the validity of the state law. And I think there's one very compelling factor that I would like to point your attention to, and that is the fact that two of the Doe's were able to obtain privileges during the course of this litigation. One of the Doe's already had them. He had them at Willis-Knighton and he had them at Christus, which is the Catholic hospital. When you speak of the Doe's, give them numbers so that we know. Okay. So Dr. Doe 3 had privileges at the outset. He had privileges at Willis-Knighton and he had privileges at Christus, which is a Catholic hospital or operated under the umbrella of Catholic hospitals. Dr. Doe 2 was able to obtain courtesy privileges during the course of the litigation, which the district court judge rejected, saying that they didn't comply. This was the Doe whose privileges he said conflicted with the language of the law. And, in fact, he adopted an interpretation of the law. But the state said they did comply, right? The Secretary of Health submitted an affidavit, a declaration, stating that she had looked at those privileges and they did comply. And he rejected her declaration and interpreted the law differently and, in fact, interpreted it so narrowly that it would render the privileges inapplicable so that he didn't have to count them. And then that subsequently resulted in a lower number of doctors available to perform abortions in the state. What is the state's interest in insisting on the doctor having privileges? How would you articulate that? So two interests, Your Honor. I mean, one, I think that the state continues to have an interest in maximizing women's health. But the second interest, and this was testified in committee and it was also part of the record, is that it is a rational part of our regulatory structure. Unlike Texas, unlike Mississippi, Tennessee, and Arkansas, we do not impose all of the ambulatory surgery center requirements on doctors. I understand that, but I just want you, if you would, to state for me Louisiana's interest in insisting upon the abortion provider having less privileges. Maximizing women's health in the face of clear evidence that it did do that, that it did help based on the testimony of one of the doctors and closing a loophole in the law. Wasn't there legislative history, testimony from women pointing out the instances where there had been a need for care past the point of the clinic? Yes, Your Honor. That testimony came from Dr. Doe III, who testified that he, in fact, used his admitting privileges after he perforated a woman's uterus, and he was able to admit her immediately to the hospital and repair the perforated uterus. He also was able to use his own admitting privileges when Dr. Doe I perforated a woman's uterus, and she then was used, he admitted her patient and fixed it. So I think there was clear evidence by the Dr. Doe's themselves, the plaintiffs, that it did, in fact, have some medical reasonableness that was applicable in this State to these doctors in our regulatory scheme, and that's significant. You mentioned earlier the contrast with Texas, but didn't the Supreme Court emphasize in whole women's health that there was no such evidence in Texas? Yes, Your Honor. That was a very significant factor to Justice Breyer in that case, that Texas had presented no evidence whatsoever that it would help a single woman, and we did have that evidence, and it came from the plaintiffs themselves. There was contrary evidence that the contrary evidence is that in only a fraction, a tiny fraction of 1 percent, are there such incidents, that these procedures are more safe than a colonoscopy, a whole range of medical services that people obtain. That's what the Court said. Your Honor, we don't, I mean, the testimony is that the procedures are generally safe, but that there are also a number of known risks. Perforating the uterus is one of them. Sepsis is another one. These are incidents that do occur, and so the doctors, I don't think, none of the doctors dispute that there are a whole range of potential complications and that most of the time, if you have a competent doctor, they're not going to have a problem, but problems do occur, even with good doctors. I understand that. My focus is that, as we all know, the Supreme Court's jurisprudency, the question is whether there is an undue burden. You agree with that, certainly. And it's not substantial. It's undue, meaning that there is, in fact, so there is a basis of that sufficient here to justify the burden that's there. And what you're confronting is a medical percentage that I don't hear anyone challenge is that this procedure is less, is more safe than a whole range of services where no touch is obtained. That's the difficulty I have, and that's why I wanted you to address that. So, Judge Higginbotham, what I would point to are two things. One, I think that Whole Woman's Health did not overrule or modify the substantial obstacle test. The burden is still to prove that if there is a burden, that it creates a substantial obstacle. So I think that that goes back to what their burden of proof is. I think the plaintiffs argue that this is now simply a pure balancing test, and I would submit to you that that is not correct, that Whole Woman's Health did not erase Casey, and it also begins with the premise that the state is permitted to regulate in a manner that maximizes women's health, and it begins with that premise. And so I don't think that it has changed the level at which states can regulate, and it hasn't changed the fact that it still has to prove that the law creates a substantial obstacle. We are not in a pure balancing environment. But there is some balancing. Whole Woman's Health mentioned the word balancing multiple times. And I think that that comes into the undue burden analysis, but I would submit that it still has to create a substantial obstacle in order to facially invalidate the law or to create an undue burden at all. Even balancing the benefits versus the burdens in Louisiana, don't you have a very different situation than the court was confronted with in Texas? You absolutely do. And I think that if you look at the statistics in Texas, for example, Texas is five times the state of Louisiana. It has five times the population. Louisiana, we had uncontradicted testimony, which was also discussed by the motions panel when the stay was issued, and I think that those findings of fact that the district court relied on at that time never changed. Our evidence was uncontradicted that women would have to travel. All women that are within reproductive age would have to travel a weighted distance of 82 miles. That was uncontradicted evidence. And if you look at even the does who had privileges, if you count Dr. Doe, too, and you look at the two clinics in Shreveport and in New Orleans, the only people who were really left out of a hundred-mile radius are a very small quarter of women who had to travel anyway, especially in Lake Charles. If you look at Lake Charles, those women were having to travel to Baton Rouge or New Orleans, or they were having to travel to Shreveport. So an hour more. So an hour more, maybe a half an hour more. I mean, it's just it wasn't the burden was not substantial. And so not only did they not prove that they couldn't get privileges because they, in fact, showed that they could get privileges, and that fact should have been beneficial to the State. If we're talking about facial invalidity and we're talking about interpreting a law in a manner that renders it constitutional rather than unconstitutional because that is the presumption that should apply, then the factors that these doctors could get privileges and did get privileges should have been favorable to the State, and, in fact, it was flatly ignored. And with regard to courtesy privileges, it was, I think, legal error. So the facts were very different. I think it also factored into the judge's ultimate conclusions on undue burden  and what he referred to the climate of Louisiana being hostile to abortion. And I submit that those were not, and poverty, too. I mean, he also relied on poverty as a factor, and I know that that was something that was discussed in Whole Woman's Health in terms of affecting the burden. But those are not factors that were created by the Act. The Act did not impose those burdens, and I think that it was legal error for him to attribute those to the Act itself. So the two clinics that had closed, what, Causeway and Bossier, those were not a result of the Act, were they? They were not. And the district court judge, and I would like to quote him because I think that the language that he uses in the judgment is troubling. He specifically says he draws no inference with regard to the closures, and there was no evidence that these closures were in any way related to the Act. But he says, and I quote, it further supports the court's findings regarding the impact of Act 620 on access. Well, if he's drawing no inference, and then he's drawing an inference, then he's using it and saying that it is, in fact, caused by the Act. So I think that that's just an inconsistent statement. If there's no inference, there's no inference, and you cannot attribute those closures to the Act. On geographical impact, I do want to go back to the point that our evidence was uncontradicted, that the plaintiffs did not present any evidence whatsoever, that there were any women, specific women. There was testimony by Dr. Katz related to the effect of poverty and some of the other factors that may be attributable to some of the population in Louisiana, but there was no testimony whatsoever about any specific women that would have to travel, any extended differences that was substantially different than what they would have to travel before. And in the Jigley case, which was an Eighth Circuit case that was issued after Whole Woman's Health, it was another attempt to facially invalidate a law, an Arkansas law, and in that case the court referred to the fact that amorphous groups of women is insufficient to support facially invalidating a law. And I submit that that's what you had here. The plaintiffs presented proof of an amorphous group of women who may have to travel farther or may have additional burdens, and they presented no specific evidence that any would, and Dr. Solanke's testimony was uncontradicted that the vast majority of women would be able to travel and would not have a substantial burden and that those within 150 miles would all be covered. So if they had brought an as-applied challenge, they still wouldn't have been successful? Your Honor, I think that they would not have been successful on the fact simply with, and I have one caveat to that, because I think that there's some significant problems of proof on their declarations, that there's this sequence of hearsay that they use to weave together their inability to get privileges. And some of them, and I can give you a couple of specific examples. Dr. Doe, too, for example. I'm sorry, Dr. Doe 5 obtained privileges at Turo and then was not denied at Women's Hospital and acknowledged in her deposition that she did not think that Women's Hospital could deny her privileges, and she didn't follow up at the other hospitals for her personal reasons. And then there was other testimony that they just didn't think they would get approved. So inconsistent testimony with the actual record. For example, Christos. One Dr. Doe 3 had privileges at Christos, and yet two of the other doctors said, well, we don't think Christos will give us privileges because Christos is a Catholic hospital. Dr. Doe 3 had privileges at Christos, and Christos's policy, which is in the record, it says that they simply don't allow abortions at their hospital. So there's nothing in the record that suggests that they couldn't get privileges, but Delta potentially would have closed if you assume the facts in the record that the Dr. Doe who worked at Delta, and I could tell you which one that is, and it does get kind of confusing, but Delta was Dr. Doe 5. Dr. Doe 5 was able to obtain privileges at Turo but had not yet been able to obtain them in Baton Rouge, and that potentially would have resulted in the Delta clinic closing. If that occurred, then I think that Delta potentially, on the right facts, then they could get as applied relief. Was he rejected in Baton Rouge or just didn't pursue it? Never rejected in Baton Rouge. Had not obtained an answer from women's hospital and had not applied to the others because her personal preference was to go to women's. I mean, she had reasons, or in the deposition, the doctor testified that she had personal reasons for not going forward with those until the first hospital responded. Personal reasons. I mean, that's not a result of the act, and there's no evidence that the doctor  In fact, none of them were absolutely denied any privileges, and the presumption should have been, based on the fact that two of them obtained them and one already had them, that it was possible. Do you think this less-than-stellar effort to obtain privileges had something to do with hoping that the facial attack would be successful? I believe so. I do believe so. I think that the proper burden of proof for facial invalidity would hold them to a higher standard and that they would have to actually go through the process and show a meaningful effort to obtain and be denied privileges and that just making up your own mind that it is not worth your effort is not sufficient. I want to talk a little bit about our regulatory scheme because I think that that is also a very important factor in this case. Louisiana has a requirement for office privileges that doctors who perform office procedures who use a single dose of an anxiety medication like Valium or Xanax and topical anesthesia are not required to have admitting privileges. It then jumps to ambulatory surgery center standards where the doctors are required to have both a transfer agreement and admitting privileges commensurate with their surgical specialties or whatever they do at the ambulatory surgery center. What the testimony was in the record in this case at the legislature and testified to by Dr. Mariette, who testified in the legislature and at the trial, was that this provision, that Act 620, filled a loophole in the law, that it was an intermediate choice, a reasonable intermediate choice that the legislature made to require the abortion doctors to have admitting privileges that were active in the sense that they were not dormant and that they essentially be commensurate with whatever their licensing was, which ties back to the licensing law. They have to be commensurate with their... whether they are OBGYNs or whether they are family practice doctors. So it is not imposing the standard upon them that Texas, Mississippi, Arkansas, or Tennessee imposed by imposing all of the ambulatory surgery center requirements on a clinic. Didn't do that. Took a very intermediate step and said, you just need to have admitting privileges. And we have evidence that it helps and that it also helps because it serves a credentialing function. And we presented that evidence, too. None of the doctors, not even the defendants, the plaintiff's doctors and their experts, disputed that these kinds of privileges do serve a credentialing function. Their testimony was that it's simply not necessary. It's not necessary. But that's not what the Casey standard is. Casey permits us to regulate at the maximum level to protect women's health as long as it doesn't create a substantial obstacle. And so if you look at our law, it was a reasonable middle ground. It did not impose the ambulatory surgery center requirements on these clinics, which had a very significant impact in Texas. If you look at whole women's health, half the clinics closed when the admitting privileges law. So you went from 40 to 20. And then when the ambulatory surgery center law took effect, you went to 8. That didn't happen here. The two clinics that closed were not related to the act, and the other three remain open and have doctors who have privileges. So I think that, again, we end up in a loop where the court refuses to acknowledge the privileges that were obtained, ignores the impact of those that did in terms of how that should be treated as a matter of law, and then ultimately comes to the conclusion that these clinics are all going to close, except for one. But even if you look at one, you still don't have the kind of distances that you had in Texas. And if you look at the facts in Texas, some of those women were, I think, that when you looked at the 200-mile mark, it was something like 2,000% increase, and it was thousands, tens of thousands of women who were being impacted, and ultimately there was another effect by the restriction of all the clinics because you had so many women. I think Texas had somewhere close to 70,000 women of reproductive age that were the relevant population seeking abortions. In Louisiana, there's 10,000 abortions on average per year. Substantially different numbers, substantially different capacities of the doctors, and I think that the capacity information was also... He exaggerated the perceived lack of capacity and then exaggerated the geographical impact, exaggerated the difficulty to obtain privileges, and ultimately then was able to essentially manufacture clinic closures. So I would say this case is different, and it does not compel the same result because we did produce evidence of medical reasonableness. We did produce evidence that there is a rational regulatory scheme, that it was reasonable, that it did not create a substantial impact. Your initial time has expired. Thank you. You've saved time for rebuttal. Thank you. Mr. Heron? Mr. Heron? Thank you, Your Honor. May it please the Court. My name is Mark Heron, and I represent the Appalachians. The district court correctly applied the Supreme Court's holding in whole women's health and held that the Louisiana admitting privileges law creates an undue burden on women seeking an abortion. The court found that if Act 620 goes into effect, most clinics in Louisiana will close. And the State only mentioned capacity at the very tail end of the argument, but the capacity, Your Honors, 70 percent of women in Louisiana will be completely denied access to abortion. That is the very definition of a substantial obstacle. What evidence supports that? Your Honor, the only clinic, the district court found that the only clinic that would remain is the clinic in New Orleans and that the only doctor who would remain in the State with admitting privileges is Doe 5, who practices at the New Orleans clinic. That's counter to what opposing counsel just said. It is, because opposing counsel is trying to rely on factual findings, is trying to overcome factual findings that are supported by clear evidence, and I'm happy to walk through the evidence. It's undisputed that Doe 1 and Doe 4 do not have active admitting privileges. The State never challenged that finding. There is simply no evidence that Doe 1 and Doe 4 could get active admitting privileges. The State's argument focuses on Doe 2 and Doe 3, and I'm happy to walk through, but I think it's important to realize there are 10,000 abortions performed in Louisiana every year. The State has no theory under which all 10,000 abortions... under which there is capacity to provide all 10,000 abortions in Louisiana. Even if you accept the State's argument that Doe 2 and Doe 3 would continue to have privileges, and I'll explain why you should not accept that argument, there would still be only about half of the capacity remaining in the State for abortions to be provided. So regardless of the State's arguments, there is no theory that the State has under which 10,000 abortions would continue to be provided in Louisiana. And so I'm happy to discuss Doe 3 and Doe 2. Doe 3 does have admitting privileges, but the State found... I'm sorry, the district court found two independent reasons why Doe 3 would stop providing abortions. One is that Doe 3 has said if he's the only remaining provider in northern Louisiana, he'll stop providing abortions. Yeah, but he's not, so he won't. He is. He won't rely on that. Your Honor, it's undisputed that he would be the only remaining provider in northern Louisiana. Doe 1 does not have admitting privileges. Doe 2, who is in Bossier, has admitting privileges in New Orleans, and the law requires that... He said in Louisiana. He didn't say in north Louisiana. You said north Louisiana. Doe 3 testified that if he's the only remaining provider in northern Louisiana, that he would stop providing abortions because he would be the only doctor  and he has been subject to harassment and threats. What about Shreveport? Doesn't he have a backup? The backup in Shreveport is Doe 2. Doe 2 does not have admitting privileges in the Shreveport-Bossier area. Doe 2 lives in Bossier. The backup to Doe 1? Who is he the backup to? Doe 2 is the backup to... So Does 1 and 3 both practice in Shreveport. Doe 2 practices or is in Bossier and provides backup support to Does 1 and 3 in Shreveport. The only reason he's able to do that right now is because the admitting privileges requirement is enjoined. If the admitting privileges requirement goes into effect, Doe 1 will stop providing in Shreveport. Doe 2 will have to stop providing in Shreveport because Doe 2's courtesy privileges, which the district court found are not even sufficient under the law, but those courtesy privileges are in New Orleans, not in Bossier. And Doe 2 does split his time between Bossier and New Orleans, or used to, actually, between Bossier and Metairie, but the clinic in Metairie where Doe 2 practiced has closed. So even if you accept this... Is that the Causeway Clinic? I'm sorry? Is that the Causeway Clinic? That's the Causeway Clinic, correct. And so the state is essentially relying on, A, Doe 2's admitting privileges being sufficient, which they're not, which I'll explain, and, 2, Doe 2, who lives and practices in Bossier City, will suddenly start working full-time in New Orleans at a clinic where he's never practiced before. That's the women's clinic in New Orleans. Did Doe 2 apply for admitting privileges in Shreveport? I'm sorry, what? Did Doe 2 apply for admitting privileges in Shreveport? Yes, Your Honor. And... Are you sure? I'm sure of that, yes, Your Honor. And he was not, did not receive admitting privileges in that area. He's only received courtesy privileges in New Orleans. And as the district court found, those privileges are not sufficient. They don't allow the... So Secretary Klebert submitted a declaration stating that Doe 2's privileges are sufficient, but it's a completely contrary... It makes no sense, because the whole rationale for Doe 2's privileges... Sorry, let me back up. The privileges that Doe 2 has are the privileges to admit patients, but not to provide services to those patients, not to provide diagnostic or surgical services to those patients at the hospital. What ACT 620 requires is that a doctor not only be able to admit patients, but also provide diagnostic and surgical services to the patient at the hospital. But diagnostic could be as simple as sending the chart along or making a phone call, right? I don't know that that's correct, but there is no... The only privileges that Doe 2 has is the ability to admit patients, not to provide... Then, after he admits patients, he must then refer and can communicate with other doctors at the hospital. But there is no diagnostic or surgical services that Doe 2 can provide at the hospital. Now, the state... Secretary Klebert's declaration said that the requirement to provide diagnostic and surgical services only applies to the hospital, not to the doctor. That doesn't make any sense, because the whole purpose for the requirement is continuity of care. The asserted purpose that the state has put forward is that the provider should be the one who can also provide the services at the hospital to ensure continuity of care. And if privileges that... If it were enough under the Act to just admit a patient to the hospital but then turn that patient over to another, then there is no justification for the law. It's completely inconsistent. It doesn't make sense, because if the patient's illness or problem is not your specialty as a physician, if you're just doing abortions and your patient is suddenly having a massive heart attack, does it make sense that you would be required to provide the service if surgery was needed or something specific to eliminate or alleviate the heart problem? Well, I think that's a reason why the admitting privileges requirement doesn't make sense. It doesn't advance any medical objective. But I think if you also look at the actual text of the statute, the text of the statute says that the physician must be a member in good standing of the medical staff, and this is in the back of the red brief in our addendum, of the medical staff of a hospital that is currently licensed by the department, with the ability to admit a patient and to provide diagnostic and surgical services to such patient. So the interpretation is that with the ability to admit a patient applies to the physician, but then and to provide diagnostic and surgical services applies to the hospital. It doesn't make any sense. It's just with the ability to admit a patient and to provide diagnostic and surgical services, if one applies to the physician, then they both would apply to the physician. But in any event, as I said, whether Doe 2 has... whether Doe 2's admitting privileges count under the Act is beside the point. What do you do about the fact that Doe 2 has declined to apply to Christus on the assumption that he wouldn't receive privileges there because it's Catholic, but the fact that Doe 3 is already admitted there? I think, Your Honor, that... The reason Doe 3 has privileges at that hospital is because he has an OB-GYN practice and has hospital deliveries at that hospital. Doe 2 doesn't have that. So there wouldn't be a reason... Well, but if the reason given... Excuse me, I did cut you off, and I apologize for that. But his reason given was that it's Catholic. I don't need to worry about it. They're not going to do anything for me. But he hasn't... The fact that Doe 3 is there, a known abortion provider, and has privileges at the hospital, it seems to me that it's unreasonable or sort of a lack of good faith that Doe 2 just says, well, I'm not even going to try. Well, Your Honor, the district court made a factual finding that Doe 2 was unable to receive admitting privileges. And, Your Honor, the state didn't... The state did not challenge that in its brief. The state challenged several other things, but the state never challenged Doe 2's inability to get admitting privileges in the Shreveport-Bossier City area. The state's only challenge with respect to Doe 2 was that supposedly their privileges in New Orleans was sufficient under the Act. Well, okay, of course, you have the burden of proof. Is there any factual support in the record for the finding that you just referred to from the district court that Doe 2 is unable to receive privileges at Christus? I believe there is. I would have to go back and look at the district court's findings on that. But, yes, Your Honor, and the state never challenged it. So, as this case is presented before this court, this court should accept that factual finding because the state has not challenged it, and the district court cited... Well, we normally don't accept factual findings where it's the plaintiff's burden and there's nothing in the record to support the finding. We're under no obligation to accept that sort of finding. So, Your Honor, regardless of that, even if you thought that there was a clearly erroneous, it doesn't get the state... The state still can't win because Doe 2 only provides 400... It's around 500 abortions a year in the Bossier area, and there still is no way that the state can get to the number where it's providing 10,000 abortions where there's enough capacity remaining. Even if you think that Doe 2 could get admitting privileges in the Bossier City area, the state cannot get enough remaining capacity because it would lose Doe 1, it would lose Doe 4, and it would lose Doe 6, and those doctors and the clinic in Baton Rouge would close. That's undisputed. Doe 5 is the only one who provides services in Baton Rouge, and Doe 5 does not have admitting privileges there. The other... So, with respect to Doe 3, again, the state has made this argument that Doe 3... Excuse me. That Doe 3's reasons for stopping providing abortion are unrelated to the act, but the district court made an independent finding that if the act goes into effect, Doe 3 will still stop providing abortions because the clinic where Doe 3 works, which is the Hope Clinic in Shreveport, will close, and that's supported by the record because this is definitely not clearly erroneous, and the reason is that Doe 1 is the primary provider at Hope. Doe 1 provides 70% of the abortions. The district court made a factual finding that if Doe 1 cannot continue to provide services that the Hope Clinic will close, and that means that Doe 3 will lose the clinic where he provides access... Excuse me, where he provides abortions. Now, Doe 3 does have... It's a separate port from the one you just made, but Doe 3 does currently have privileges at two hospitals within 30 miles of Hope Clinic. Isn't that right? That's right, but the reason is because Doe 3 only provides abortions one and a half days a week. His primary practice is as an OB-GYN, and Doe 3 only provides... ..about 1,200 abortions a year. So even if... Again, the district court made factual findings that even if you accept the state's argument that Doe 3 and Doe 5 will continue providing abortions, that will only come up to about 4,500 abortions a year capacity. That is, 55% of the women in the state will be completely denied access to abortion, even if you accept the state's arguments. And that... I think it's important to note that that's not simply... Does that number that you've calculated, whether it's accurate or not, we can check, but does that assume that no doctor will increase his or her number of abortions that he or she is willing to perform? It does assume that. It's based on the current number of abortions that are provided, but it's important to note that in Whole Women's Health, the Supreme Court rejected the state's argument that the state could just count on providers providing more abortions. Well, but in Texas, I mean, the numbers were so dramatically different. I mean, there was several... greater order of magnitude of the number of abortions that would have to be increased by the remaining providers at the remaining clinics. So I don't quite understand how that spills over into this case. General, I don't think that's actually correct. The state says that, but in Texas, the record was that there were 60,000 to 70,000 abortions provided a year in Texas, and the remaining clinics would have to essentially quadruple. But here, there would be, under the district court's primary factual findings, there would be one provider left in Louisiana. That one provider cannot provide 10,000 abortions a year in Louisiana. Even if you accept that there is Doe 5 and Doe 3, even if you accept that Doe 3 doubles the number of abortions that he provides, you still have about 5,000 abortions, lack of capacity of 5,000 abortions. And in fact, during the Whole Woman's Health argument, Justice Alito remarks that the evidence of capacity in this case... Because at that time, this exact same record was before the Supreme Court while the Supreme Court was deciding Whole Woman's Health. The record here is the same record after the preliminary injunction. After the preliminary injunction issued, this court issued a stay of the preliminary injunction. The Supreme Court, looking at this exact same record, vacated that stay. And there was only one dissent from the denial... from the vacation of that stay, that the standard is that this court's ruling was demonstrably wrong. So that's what the Supreme Court had to find to vacate that. This is the same record. In fact, Justice Alito remarked during oral argument at Whole Woman's Health that the evidence of capacity in this case is better than the evidence of capacity that was in the Texas case. So I think there is no way, Your Honor, that to reverse the district court here would be completely inconsistent with the Supreme Court's decision in Whole Woman's Health. The record here is substantially the same. There is no medical benefit. The district court made that finding. It's consistent with the Supreme Court's findings. There is no... And I'm happy to discuss the evidence of benefits, but I think it's important that there is no... In terms of capacity, there is no way that the state can get to the number of abortions... to 10,000 abortions a year. And if women are denied capacity or are denied access to abortions, that's not simply... That creates burdens on all women. Because there would be congestion in the clinics, there would be... And these are the same things that the Supreme Court discussed in Whole Woman's Health, that women will be forced to delay their abortions because it will take longer to get a clinic that will push abortions from the first trimester into the second trimester, as the district court found here, where the complication rate, although still very low, is much higher in the second trimester than it is in the first trimester. And so for those reasons, the district court actually found that this law does not promote women's health, but it actually harms women's health. It would delay women... Women would be delayed to the point that they would not be eligible any longer for medication abortions. They would have to have surgical abortions. So there's a whole... The whole, you know, panoply of findings that the district court made about the substantial obstacle in women... The state wants to just focus on driving distances even if you accept the state's... Well, there was a lot of emphasis in Whole Woman's Health on driving distances. I think that's a legitimate... Well... One of the things that we should focus on. Whole Woman's Health focused first on the lack of capacity, and then it said that the driving distances were an additional burden on women. It didn't focus exclusively or even primarily on driving distances. But here, even if you accept the state's argument that Doe 3 and Doe 5 will continue to provide abortions, there would be, in northern Louisiana, one provider who provides abortions one-and-a-half days a week. Would you please... I'm going to shift just for a minute. Would you address the district court's weighing of the fact that, in the district judge's view, Louisiana is a state that's hostile to abortions? I have a hard time seeing how that should be weighed at all in a facial challenge. The suggestion, if I understand it, and if I misunderstand it, you can clarify, is that if this same law were passed in, say, New Jersey or Oregon, that the result might be different if there's a perceived less hostility in either of those states to abortion generally. So I don't think that's what the district court was saying. There were a couple of pages in the district court's opinion that simply discussed and laid out what Louisiana's regulations of abortion are. The district court did not then make any large inferences. It just discussed... And the state does not dispute any of those things that the district court said are true. Does that have any relevance? Yes. Okay. Tell us what relevance it has. Yes, that's where I was going. So, for example, Louisiana has a 24-hour waiting period. That means that if women have to, under the district court's initial findings, the only remaining provider would be in Louisiana. So women, for example, would be in New Orleans. So women in northern Louisiana, for example, would have to travel to New Orleans, which I understand that Louisiana is not as large a state as Texas, but it's still a 325-mile drive, 5-hour drive or more from Shreveport to New Orleans. And because of the 24-hour waiting period, women would have to spend two days in New Orleans, essentially, come once for the consultation, and then either make a second trip or remain. And that... It's the... That exacerbates the burden. That's how it's relevant. The district court also did not... Did not... You know, the state has a climate against... The district court discussed the state's climate in terms of private parties, and the state is arguing that the district court attributed private parties' anti-abortion action to the state. That's not at all what the district court did. But, you know, that's relevant to the district court's factual finding that Doe 3 will stop providing abortions if the law does go into effect. But, again, even if you don't accept that, you don't have to accept the district court's finding that Doe 3 will stop providing abortions, because even if it does, the court found that only... that 55% of Louisiana women will still be completely denied access to abortions. I do want to address... The state makes a lot of emphasis on... You said it was 70 earlier and then 55. What's the... I know that wasn't an error on your part, but explain the difference between those two numbers. So the district court's initial finding was that Doe 5 will be the only remaining provider. If Doe 5 is the only remaining provider, Doe 5 performs 3,000 abortions a year out of the 10,000 abortions in the state. So 70% of women will be denied access. As an alternative finding, the district court found that even if Doe 3 continues to provide abortions, that because Doe 3 provides about 1,200 abortions a year, that that would only add up to about 4,500 abortions a year out of the 10,000, so there will still be 55% of women who will be denied access. All right, thanks for that clarification. Yes, sir. You laid it out, but I just want to be sure that I understood the difference. Absolutely. No problem. So I want to address the two incidents that the state relies on very heavily about the two perforated uteruses that Doe 3 had. So the evidence before the district court, the district court's factual findings were that the complication rates are extremely low, and that's the same findings. It's essentially the same evidence that was before the Supreme Court in Whole Women's Health, and so those findings can't be clearly erroneous. The state wants to... Of course, in Whole Women's Health, it was zero, wasn't it? No, I'm saying that the rate of complications during abortions. In Whole Women's Health, the court did remark that there are complications during abortions, but the rates are extremely low. But no evidence of actual complications, is that right, in the Texas case? The Supreme Court said that there was no evidence where the admitting privileges requirement made a difference in terms of providing better health to a woman, and I would submit the same is true here, because Doe 3, those two... So all that Doe 3 testified is, there were two instances where there were perforated abortions. Because I had admitting privileges, I performed the surgery at the hospital. Doe 3 never said that... And there was no evidence that, as a result of Doe 3's having admitting privileges, those women received better care by Doe 3 than they would have received had they been treated by a different physician at the hospital. The district court discussed transfer agreements. Abortion clinics are required under current law, without the admitting privileges requirement, to have transfer agreements, so that women will receive continuity of care. And those transfer agreements, in fact, the states... There's deposition testimony from the states, the head of the Louisiana Board of Medical Examiners, and from former and current employees of the DHH, that there's never been... They're unaware of any incidents where simply having a transfer agreement provided that there were women who did not receive proper treatment as a result of just having a transfer agreement in place. But the point is that the standard of care, as recognized by the district court, as recognized by the American Medical Association, is that if there is a complication that arises, the patient will be transferred to the hospital and will be treated by the attending physician at the hospital. There is no evidence in this record, including those two incidents that the state relies on, that women receive better care as a result of having the abortion provider provide the surgical services in the hospital than they would receive if there were a different physician at the hospital providing those same services. And, in fact, I think it's really important to note that the vast majority of complications that occur happen at home, after the abortion has already taken place, where it's extremely rare. In fact, the district court found that it's one out of only a few thousand instances of complications where a woman... is transferred from the clinic itself to the hospital. The vast majority of complications occur after the woman has already gone home, and the standard of care for that woman is, if she does need to receive emergency treatment at a hospital, she would go to the nearest hospital. She wouldn't... Wouldn't a better doctor provide better care? Like, what is your position on the fact that these physicians having to qualify for admitting privileges, that that would be a significant... like a credentialing situation, a credentialing function, where, okay, if they satisfy the requirements of the hospital, then they're trained better or more qualified or something. I mean, do you think that that's totally insignificant? So the district court made factual findings that were reviewed for clear error that these doctors were denied admitting privileges for reasons completely unrelated to their competency or to credentialing. The hospitals, there is no requirement in Louisiana, for example, that... that the hospital has to provide admitting privileges to any doctor who... You have to qualify. You have to qualify, but then the state can... but then the hospitals can deny admitting privileges for a multitude of reasons, completely unrelated to competency, completely unrelated to credentialing. For example, the vast majority of hospitals would require that admitting... require that in order for you to... for a physician to receive admitting privileges, the physician must expect that they're going to admit patients to the hospital, and enough patients that it makes financial sense for the hospital to grant admitting privileges to that doctor. But the complication rate of abortions is so low that abortion providers don't expect that there will be any... They won't meet the minimum. They won't meet the minimum, exactly. So, yes, credentialing is a factor that the hospital might look to, but as the district court found, and in fact the Supreme Court in Whole Woman's Health held that admitting privileges requirement serves no credentialing function. And so, again, it can't be clear error or erroneous for the district court to, on this same... to make that finding as well. Well, we'll see. I'm happy to answer any additional questions that the court may have. Thank you, Mr. Heron, and we appreciate your firm's willingness to handle this case, and you've done a good job. Thank you, Your Honor. We would ask that the district court... Ms. Merrill, you save time for rebuttal. Your Honors, I'd like to... hit on a couple of factual points. I want to walk through real quickly, just walk through the Dr. Doe's, and just sort of to bring home the point of who had privileges and what they did to sabotage their own applications, basically. Dr. Doe won, board certified in family medicine and addiction medicine, applied at Menden Hospital, was not given privileges there, submitted an application to Willis-Knighton for addiction medicine, not family medicine. And so why she didn't submit an application for family medicine, which is her board certification and which she had actual proof that she had done a residency in, the record doesn't say. Doe, too, obtained privileges at Tulane, worked as an assistant clinical professor of medicine at LSU Medical School for 18 years and had admitting privileges at various hospitals when he had a general OB-GYN practice. Told Willis-Knighton that they would have to come to the clinic to look at the documentation that they requested for his application. Said, you know, well, you're just going to have to come to my clinic to find that stuff if that's what you want, if you want to look at that. I mean, that's, you know, another evidence of sabotage. Doe, three, had admitting privileges at Willis-Knighton and at Christos and had had those since the 90s at Christos while he was performing abortions and at Willis-Knighton since 97 or 98. Clear evidence that both of those hospitals would, in fact, give privileges to someone even if they were performing abortions, because he had been. Doe, four, ceased practicing after Causeway closed and was 82 years old when he retired. No inference to be drawn from that. Doe, five, has privileges in New Orleans, but not in B.R., obtained privileges at Toro. Testimony of Doe, five, did not call to check up on Lane and Baton Rouge General, being that I felt my best chances for privileges would have been at women's. They cannot deny my privileges. From what I'm told, I meet all of the qualifications, and as long as I meet those, they cannot deny it. It will stay pending until I find someone to cover me. In Baton Rouge General, one of the requirements for that hospital is that you have to take what's called city call, whether you're, by the hospital terms, whether you're courtesy, you have to take city call, and that's something I really don't want to have to be subjected to. So personal reasons. Doe, six, said he contacted Tulane but was told not to bother. That's inconsistent with Doe, two. So those are the facts related to their efforts to obtain their privileges. With regard to the perforated uterus, I want to just read to you what Doe, three, testified in the case. He testified that the uterus was perforated and it was unsafe to continue with the abortion, so we transported the patient to LSU. And since I was on the staff, I went ahead and accompanied her, and then I taught the residents what to do in that situation. We did a laparoscopic termination of the pregnancy at that point to be able to confirm that we had not damaged any organs and any of her vital organs inside, and she did well. We went home the next day. Clear evidence that there was medical reasonableness in this particular requirement. Absent in Texas, present in Louisiana. And so I just want to kind of bring this back full circle to the burden of proof to facially invalidate a law. There's a higher burden for facial invalidity because it thwarts the democratic process. That's very important to the states. These are not the only—this is not the only case. We've got a lot more in the pipeline, as does Mississippi and Texas. So it matters that the district courts apply the burden for facially invalidating a law properly, and it matters that they apply whole women's health properly and they interpret it properly. And here, the state regulatory scheme is different. We did not hold abortion providers to the same standard as ambulatory surgery centers or the doctors who work there. We chose a reasonable intermediate position that reflects the level of anesthesia that is used in these procedures because it's not simply always local. The ACOG guidelines actually say, don't single out abortion providers. We didn't. We didn't. And yet our law has been held to be facially invalidated. The facts are different. It is not the same record. It is not even close to the same record as Texas. We showed proof of medical reasonableness, which is a significant problem that the Supreme Court identified in whole women's health. Do you have any response to Mr. Heron's comment about Justice Alito's comment regarding the record in this case? Your Honor, honestly, I'm not sure I can specifically recall exactly what Justice Alito said. I think that Justice Breyer commented that there was evidence in this case. Justice Breyer was very focused on the fact that there was no evidence of medical reasonableness brought by the state to back up the claim that it was medically reasonable as a justification for the law. And we have both. So I think that... All right, you've answered my question. Thank you. And your case is under submission. The court will take a recess before...